BELLEVILLE NATIONAL SAVINGS BANK, Adm'r of the Estate of Corinn Samotis, Deceased, Plaintiff-Appellant, v. GENERAL MOTORS CORPORATION et al., Defendants-Appellees.

(No. 73-208; ▮▮▮▮▮▮)

Fifth District—July 2, 1974.

John E. Norton, Professional Corporation, of Belleville (Edward J. Kionka, of counsel), for appellant.

Pope and Driemeyer, of East St. Louis (W. Thomas Coghill, Jr., of counsel), for appellees.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

This is an appeal by the plaintiff from a judgment entered by the circuit court of St. Clair County on a directed verdict in favor of parties-defendant. The plaintiff, Belleville National Savings Bank, the administrator of the estate of the deceased (Corinn Samotis), brought this action to recover damages for the death of plaintiff's decedent who was killed

when the automobile being driven by her husband, John Samotis, in which she was a passenger, crashed. Suit was brought against the manufacturer, General Motors, on the theories of strict liability in tort and negligence, and against its dealer, Schmidt Motor Company, on the theory of strict liability in tort. The case was tried before a jury. At the conclusion of plaintiff's case parties-defendant made a motion for a directed verdict which was sustained by the trial court.

■■ It is, of course, the duty of a judge in a jury trial not to invade the province of the trier of fact. This restriction permits the trial court to direct a verdict "* * * only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R. R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 510.

Applying the *Pedrick* standard to the instant case, we find that the evidence taken in its aspect most favorable to the plaintiff does so overwhelmingly favor the defendants that a verdict in favor of the plaintiff could never stand.

Mr. and Mrs. Samotis purchased a new 1969 Oldsmobile from Schmidt Motor Company; it was delivered to them on April 1, 1969. On April 25, 1969, the accident occurred which caused the plaintiff decedent's death. The car was less than 1 month old and had about 1000 miles on it. The steering mechanism, which was alleged to be the cause of the accident, had been manufactured by Saginaw Steering Gear, a division of General Motors. The steering mechanism consists of a pump, a steering gear, and two hoses. The pump and the steering gear were fully assembled by Saginaw and delivered to the Oldsmobile assembly plant. At Oldsmobile the pump and the steering gear were put in the car and connected by the two hoses.

■■ Under the doctrine of strict liability the essential elements which the plaintiff must allege and prove in order to establish a prima facie case are: first, that the injury or death in question was proximately caused by a condition of the product; secondly, that the condition was an unreasonably dangerous one; and lastly, that the condition existed at the time the product left the defendant's control. *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182, 188.

The trial court directed a verdict for parties-defendant at the close of plaintiff's case because it found that the "circumstantial evidence presented" left "the issues of defective condition [unreasonably dangerous condition] and proximate cause in this case a matter of guess or conjecture for the jury." Thus the sole issue before us is whether plaintiff's

evidence, taken in its light most favorable to the plaintiff, is sufficient to satisfy the first requirement of the *Suvada* rule in view of the overwhelming refutative evidence which was presented as a part of plaintiff's case.

Plaintiff cites numerous cases for the proposition that a *specific* defect need not be established in a products liability action. A careful reading of those cases reveals that the requirement that the plaintiff establish the precise cause of his injury may, at times, be excused in an action grounded on strict liability in tort provided the plaintiff establishes some credible basis for the reasonable inference that a condition of the product proximately caused the injury or, as in this case, the death of the plaintiff.

The *Pedrick* case is different from the instant case because in the instant case only the evidence presented before the direction of the verdict was that of the plaintiff. Therefore we do not have the same basis of comparison as the supreme court did in *Pedrick, i.e.,* comparing the equivocal nature of the plaintiff's evidence to the unequivocal nature of defendant's evidence. Nevertheless, we are able to consider the plaintiff's evidence together with the reasonable inferences therefrom taken in the aspect most favorable to the plaintiff and decide whether a verdict based on that evidence could stand. In other words did the plaintiff introduce any evidence from which it might reasonably be inferred that a condition of the product proximately caused plaintiff's decedents demise?

The plaintiff's case is based upon several inspections of the steering gear mechanism and the testimony of eight witnesses, five of whom were offered as experts. Appellant contends that the testimony of these witnesses was unequivocal insofar as it established (1) that foreign matters could be filtered out of the steering mechanism and that General Motor, by design, did not put in filters to keep foreign particles out of the steering mechanism, and (2) that foreign particles were in fact found in one of the hoses that connected the pump and the gear, in particular—a chip of wood, a pin of hardened steel, a piece of ductile metal, another metallic piece of very light weight non-ferrous material and several objects which appeared to be silicate or stone.

The plaintiff concedes that none of these particles caused the jamming of the steering mechanism; however, he contends that from the presence of these particles it might reasonably be inferred that other particles capable of jamming the steering mechanism were present in the system, since there was no filter. Yet none of the plaintiff's "expert witnesses" could, upon inspection of the steering mechanism, find any

evidence that such mechanism had jammed other than the aforementioned particles which were flushed out of one of the pressure hoses on the third of four separate inspections.

The first inspection, which occurred approximately 10 days after the accident, was conducted by a representative of General Motors and another witness. They started the automobile and both rotated the steering wheel from lock to lock. More than 1 month after the first inspection one of the plaintiff's experts, an automobile mechanic, and an investigator employed by the plaintiff's attorney took possession of the automobile. At this time a second inspection was conducted. Once more the steering wheel was rotated from lock to lock without sticking or jamming. The oil was pumped out of the pressure hose and was sent to Detroit for examination at the workshop of plaintiff's expert. The steering system was also sent to Detroit for further examination. During the third inspection, in Detroit, plaintiff's expert filtered the oil and back-flushed the pump and the hoses of the steering mechanism with carbon tetrachloride. The filtration of the oil revealed no foreign material; however, upon back-flushing certain foreign particles were filtered out of one of the high pressure hoses. These foreign particles (previously described) were introduced into evidence. Due to the illness of plaintiff's expert witness another "expert" was retained by the plaintiff. This second "expert" took the steering system to Saginaw Steering Division of General Motors for a fourth inspection. The gear was disassembled, and no additional particles were found. At the conclusion of this inspection, the steering system was re-assembled as a working unit and installed on a vehicle and test driven. The automobile was driven for a short time, and the steering system seemed to work properly. The steering system was then removed from the test vehicle and returned to the custody of plaintiff's expert.

Each of the plaintiff's experts testified that it was possible for foreign matter to jam the steering mechanism. There is no dispute that a foreign particle could jam the steering mechanism. Therefore, the issue is whether there is any credible evidence which would reasonably lead to the inference that this or any other malfunction of the steering occurred in the instant case.

The plaintiff concedes that "this case stands or falls with the testimony of John Samotis." "The plaintiff claims that John Samotis was "not impeached in any way." Although we agree that plaintiff's case "stands or falls" on the testimony of John Samotis, we find John Samotis' testimony of dubious probative value when considered in light of the testimony of plaintiff's own expert witnesses and the testimony of two persons with no apparent interest in the outcome of this lawsuit.

John Samotis testified that as he started to make a slight gradual turn to his left the steering wheel not only jammed making it impossible to turn to the right, but the steering wheel continued to turn an additional 180 degrees to the left and caused him to leave the highway, and crash into an overpass abutment. Although one of the plaintiff's experts testified that jamming might create such a sensation, each expert who testified on behalf of the plaintiff stated that if the steering actually malfunctioned, the steering wheel would not continue to turn in the manner described by the witness.

John Samotis denied that he was weaving from one traffic lane to another traffic lane immediately preceding the crash which caused plaintiff decedent's demise. He said he made only one turn from his right hand lane toward his left to pass and that he thereafter continued off the highway and into the overpass abutment. Charles Steel, a disinterested eyewitness, testified that John Samotis attracted his attention by weaving "from one traffic lane to another traffic lane in what we call a lazy S pattern." Plaintiff's experts agreed that weaving of this nature, unless accompanied by skidding, would indicate that the steering was not malfunctioning as John Samotis claimed. The Illinois State trooper who investigated this accident, Thomas Beatty, did not find such a weaving pattern of skid marks.

One of plaintiff's expert witnesses testified that if the steering wheel were jammed to the left as described by John Samotis, the front wheels should have been turned to the left when the car came to a final rest. Charles Steel testified that the front wheels faced straight ahead when he came upon the scene of the accident immediately after the collision.

At the trial John Samotis claimed that he remembered every detail of the evening of the accident from the time he left his home up to and including collision with the abutment. He denied having talked to Trooper Beatty. Trooper Beatty testified that on the evening of the collision, after clearance from doctors, he talked with John Samotis. During this interview John Samotis appeared, to Trooper Beatty, to be rational. Trooper Beatty stated that John Samotis told him that he remembered having a "couple of drinks" at home but that he could not remember anything after he left his home or anything about the accident.

At most the evidence produced during the testimony of plaintiff's experts, was only evidence that such particles as were described as found in the hose, if they had entered the mechanism proper, might cause jamming. However, the experts concluded and the plaintiff concedes, that due to the size of the opening and design it was impossible for such particles to enter the gear mechanism. Plaintiff would from that evidence draw the inference that the existence of such particles in the

hose make it probable that other particles capable of causing the gear to jam could have been within the mechanism proper, and that the testimony of John Samotis is not inconsistent with such inference. The difficulty with such a contention is that none of plaintiff's witnesses could find any evidence to the effect that jamming of the gear or any other malfunction of the steering had occurred and the probative value of John Samotis' testimony is reduced by unequivocal testimony of plaintiff's non-interested witnesses, Trooper Thomas Beatty and Charles Steel.

Although the plaintiff, in an admirable effort to rehabilitate John Samotis, advances various hypotheses to explain these discrepancies, we believe it may fairly be said that in view of the foregoing evidence the testimony of John Samotis is of little probative value.

In *Pedrick*, our supreme court concluded by stating that:

> "When the dubious probative value of the testimony of the plaintiffs and Hazel Lindsey is considered in the light of the unequivocal testimony by persons with no apparent interest in the outcome of this lawsuit and the corroborative testimony of the railroad employees, we believe it may fairly be said that all the evidence, viewed most favorably to plaintiffs so overwhelmingly favors defendant that no contrary verdict based on this evidence could ever stand." (37 Ill.2d at 511, 229 N.E.2d at 514.)

Similarly in *People v. Rosochacki*, 41 Ill.2d 483, 490, 244 N.E.2d 136, 140, our supreme court stated:

> "Our *Pedrick* decision fully contemplates that the trial courts are to decide when weak evidence has so faded in the strong light of all the proof that only one verdict is possible of rendition."

From these pronouncements it may, and quite properly should, be inferred that although the trial judge must view the evidence in its light most favorable to the non-movant he need not accept all evidence of the non-movant as true when determining whether there is any credible evidence on which to allow the case to go to the jury. This is not to say that a trial judge may determine the sufficiency of the evidence. However, the presence of some slight evidence which loses its significance, when viewed in the context of all the evidence does not impair the direction of a verdict. *People v. Rosochacki*, 41 Ill.2d 483, 244 N.E. 2d 136; *Pedrick v. Peoria & Eastern R. R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504; *Liberio v. Patton*, 9 Ill.App.3d 955, 293 N.E.2d 415; *Perec v. Little*, 106 Ill.App.2d 308, 245 N.E.2d 886.

Before treading upon this delicate area this court has, with a deep concern for the preservation of a viable jury system, carefully considered the rights, constitutional and otherwise, involved. An example of our reluctance to intrude upon this hallowed ground can be found in *Waters*

*v. Chicago & Eastern Illinois R.R. Co.*, 13 Ill.App.3d 661, 300 N.E.2d 521, wherein we found facts contained in the record which provided a basis for the determination that a jury verdict was not based on imagination and speculation. However, we are unable to ferret out such facts in the instant case.

■■ We, therefore, find that when the dubious probative value of John Samotis' testimony, on which plaintiff's case "stands or falls," is considered in the light of the unequivocal testimony by persons with no apparent interest in the outcome of this lawsuit, it may fairly be said that all of the evidence presented thus far, viewed most favorably to plaintiff so overwhelming favors defendant that no contrary verdict based on this evidence could ever stand. Accordingly, we find that the direction of a verdict by the circuit court of St. Clair County in favor of parties-defendant is correct and is hereby affirmed.

Affirmed.

G. MORAN, P. J., and CARTER, J., concur.