KENILWORTH REALTY COMPANY, Plaintiff-Appellee, *v.* OLIVER SANDQUIST, Defendant-Appellant.

First District (3rd Division)   No. 76-794

Opinion filed December 21, 1977.

SIMON, P. J., dissenting.

Francis W. Faris, Jr., and Joel R. Nathan, both of Daniels, Hancock & Faris, Ltd., of Elmhurst, for appellant.

Edward J. Kelly, of Chicago, for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

This action was brought by plaintiff Kenilworth Realty Company and/or George Dadian d/b/a Kenilworth Realty Co. (hereinafter "Kenilworth") to recover damages occasioned by the alleged breach of an exclusive real estate broker's contract by the defendant, Oliver Sandquist. A jury rendered a verdict for $48,000 in favor of the plaintiff. Judgment was entered on the verdict. The defendant appeals from the entry of that judgment, alleging error in the refusal of the Municipal Department to transfer the case to the County Department, Law Division, when the complaint was amended to increase the *ad damnum* from $15,000 to $48,000 thereby exceeding the dollar limit placed on cases to be heard in the Municipal Department; questioning whether the plaintiff stated a cause of action for breach of the broker's agreement and is entitled to its commission where the principal terminated the contract and revoked the broker's agency before the property was sold. The defendant also claims that the plaintiff is barred from recovering either in contract or *quantum meruit* in the absence of evidence of the value of its services, and alleges reversible error where the court did not allow the defendant's instructions regarding the consequences of revocation of a broker's authority with and without cause to be submitted to the jury.

On December 3, 1973, the defendant, Sandquist, signed an exclusive listing agreement with the plaintiff, Kenilworth, to sell his 34-unit apartment building in Skokie, Illinois.

The essential terms of the agreement provided:

"Price: $950,000 or such lesser amount as seller may agree to accept.

Realtor shall have sole authority to advertise, display signs, and sell the property for a period of 6 months, and thereafter until said authority is cancelled by 30 days advance written notice of either party to the other.

Seller agrees to cooperate fully with realtor and refer all inquiries; to conduct all negotiations through him; to pay a real estate brokerage commission of 5% plus $500.00 if a contract to purchase and sell the property is executed by seller and purchaser through the services and efforts of realtor, sellor or by or through any other persons during the period of this agreement or if such contract to purchase and sell is executed within six months after termination of this agreement with a purchaser to whom it was offered during the period hereof."

In late January, 1974, through Homefinders of Chicago, a corresponding broker, Kenilworth, contacted a potential purchaser, Triangle Builders. Roy Gromke and Don Metroff, individually and in their partnership as Triangle Builders, had successfully engaged in converting apartment buildings to condominiums, and over a period of more than 10 years, had developed sources of financing with Northwest Federal Savings and Loan, and Fidelity Savings and Loan. Neither institution had ever denied financing to Gromke, Metroff or Triangle Builders. Before making any offer to Sandquist, Gromke took the proposed transaction to loan offices at both Northwest and Fidelity. Both orally committed their respective lending institutions for financing of the deal, although the commitment of Fidelity was subject to an inspection of the interior of the premises. According to the testimony of Robert Holzer of Northwest, the great bulk of their business was done on an oral basis.

On January 29, 1974, Triangle submitted an offer of $920,000 payable in cash at closing with a 20-day mortgage contingency clause to Sandquist through Kenilworth. This offer was rejected on January 31 as being too low. Later that same day, the offer was raised to $935,000, but again was rejected as being too low.

On February 1, 1974, a third offer was made by Triangle Builders. The offer was in the amount of $950,000, $5,000 of which was to be paid immediately, to be increased $20,000 within 20 days which would represent earnest money, with the balance to be paid in cash at closing. The offer was conditioned upon the purchaser's ability to obtain a loan in an amount equivalent to 75% of the purchase price within 20 days.

Orally on February 4 and in writing on February 5, Sandquist rejected

the offer. In the course of the February 4 telephone conversation, the defendant indicated he was rejecting the offer because of the mortgage contingency clause, which he felt did not make it a viable offer. His letter of February 5 stated: "Contract rejected as not being in accord with terms and conditions set forth in the listing agreement." Following receipt of the letter, Gromke contacted Sandquist about the rejection and was told that Sandquist "was concerned about the tax position it might put him in if he sold the building at this point." Later in February, at the request of Triangle, Sandquist met with Gromke, Metroff and their C.P.A. at his office. Gromke advised Sandquist that Triangle was in a position to close the deal if Sandquist could bring title down. There was no discussion of the financial position of Gromke, Metroff and/or Triangle Builders. Extensive discussions dealt with tax problems and various tax approaches which might be beneficial to Sandquist, including a possible conversion of the property into condominiums with Sandquist being permitted to buy into the conversion undertaking. The $950,000 offer was not retracted. However, no agreement was reached at the meeting.

At the end of February, 1974, Gromke and Metroff contacted Joan Manker of Kenilworth, requesting a master appraisal so they could submit a full cash offer with no mortgage contigency clause. Sandquist testified that he received a call from Manker on a Friday near the end of February and she requested to see the building that day. He responded that he was not available until the following Monday. About one-half hour later, Metroff called and tried to persuade Sandquist to show the building that same day. Sandquist refused, reiterating that he would show it on Monday, to which Metroff then agreed. That same Friday evening, Sandquist went to the building and became furious when he learned that the janitor had shown the building to Manker without his permission. She had also given the janitor $5. However, Manker testified that Sandquist had set up an appointment for 12:30 p.m. on Friday, March 1, for her and the master appraiser to see the building and that she had given the janitor "a tip of five dollars."

On March 7, 1974, Sandquist wrote George Dadian of Kenilworth Realty terminating the agreement claiming that Kenilworth had breached specific agreements by showing the property to prospective purchasers without informing him prior thereto, by attempting to bribe his janitor, and by refusing to furnish all bona fide offers. The reference to not forwarding all bona fide offers apparently referred to an offer from Philip C. Goldstick to purchase the property for $950,000. According to Dadian's testimony, Goldstick's real estate agent came to Kenilworth and withdrew the offer. Goldstick's offer was for an exchange of a building to be traded for Sandquist's building. In addition, there would be cash paid over a

period of five years as Goldstick converted Sandquist's building into condominiums. Kenilworth's position was that this was not an offer within the terms of the listing agreement.

The following day, March 8, Sandquist again met with Gromke and Metroff, and according to Gromke, discussed various tax considerations which would make the sale more advantageous to Sandquist from a tax standpoint. On March 19, 1974, Dadian wrote to Sandquist, denying the alleged breaches and stated that Kenilworth considered the contract "fully valid and in force."

On April 8, 1974, Triangle Builders through Kenilworth delivered a $950,000 cash offer without a mortgage contingency clause to Sandquist. On April 15, 1974, Sandquist's attorney returned the contract unaccepted, noting that the listing agreement had been terminated previously.

■■  The defendant points out that the complaint was initially filed in the Municipal Department with an *ad damnum* of $15,000. Later it was amended to include a *quantum meruit* count and a contractual count, each with an *ad damnum* of $48,000. The defendant immediately moved to transfer the action to the County Department, Law Division, since the amount at issue now exceeded the limit set for actions filed in the Municipal Department. (See Rules of the Circuit Court of Cook County, General Order No. 1.) However, two judges subsequently denied the motion to transfer, based on the generally adhered to policy that once properly filed and lawfully within a district, that district retains the case, even though subsequent amendments exceed original filing limits. No question can be raised regarding the original jurisdiction of the court over the parties or the subject matter. In view of the Circuit Court of Cook County Rule 1—3(b) which states "No action shall be dismissed and no judgment order or decree vacated, set aside or invalidated because the action was filed, tried or adjudicated in the wrong department, division or district" we find no reversible error in the failure of the court to transfer the case to the County Department.

■■ ■  The defendant next argues that the plaintiff failed to state a cause of action for breach of contract because the agreement had been terminated and the broker's agency revoked before the property was sold. The parties agree that Sandquist had the *power* to revoke Kenilworth's listing at any time. (See *Nicholson v. Alderson* (1952), 347 Ill. App. 496, 107 N.E.2d 39.) However, the more important issue here is whether the principal rightfully revoked the agency and at such time as to avoid liability for the full amount of commission. The court in *Nicholson* discussed the principal's liability for termination of a contract, quoting from volume 4 of Ruling Case Law (4 R.C. L. *Brokers* §9, at 254 (1914)):

" 'Where the principal has entered into a binding contract to continue the employment for a certain length of time, he cannot

revoke the broker's agency, unless it be for misconduct, without rendering himself legally liable for such damages as are the proximate result of his act. While the law recognizes his power to revoke the broker's authority even under such circumstances, it does not recognize his right to do so, for it results in a repudiation of his contractual obligations.' " (*Nicholson*, at 507.)

The defendant implies that the contract was revoked "with cause" because the plaintiff "did not act in the utmost good faith" in his relationship with Sandquist. The defendant then states that despite arrangements made to show the building on March 4, the plaintiff took it upon herself to take the appraiser through the building on March 1, bribing the building's janitor with $5. However, there was conflicting testimony regarding this incident, with Manker of Kenilworth stating that an appointment had been made for Friday, March 1, and that the $5 was given as a show of gratitude. There was also testimony as to Sandquist's concern over the tax consequences of a sale at the time Triangle made its offer. The jury heard the evidence presented and was instructed regarding the burden of proof on the issue of whether Sandquist terminated the listing agreement with or without legal justification. The question was one of fact for the jury to decide, and we will not upset their conclusion that the termination was without legal justification.

The issue then becomes whether Kenilworth produced a buyer ready, willing and able to purchase the property on the terms offered, since "[t]he principal cannot revoke the agency after the broker has procured a purchaser, able, ready and willing to buy." (*Purgett v. Weinrank* (1920), 219 Ill. App. 28, 31.) *Garrett v. Babb* (1975), 24 Ill. App. 3d 941, 944, 322 N.E.2d 217, elaborated on this basic standard:

> "The general rule regarding brokers' commissions was stated by the Illinois Supreme Court in *Fox v. Ryan* (1909), 240 Ill. 391, 396, 88 N.E. 974, 976, as follows:
>
>> 'Where a broker is employed to sell property by the owner, if he produces a purchaser within the time limited by his authority who is ready, willing and able to purchase the property upon the terms proposed by the seller he is entitled to his commissions, even though the seller refuses to perform the contract on his part. In such case, however, it is necessary for the broker to prove the readiness, willingness and ability of the purchaser to take the property on the terms proposed.' "

There is no question but that the rejection of the first two offers of $920,000 and $935,000 respectively for failure to meet his asking price was clearly within Sandquist's power and right. The controversy surrounds the rejection of Triangle's third offer made on February 1, 1974. That offer

was for $950,000 with the full purchase price to be paid in cash at closing. However, the defendant argues that this offer was not within the terms of the listing agreement and that the potential purchaser did not demonstrate a financial readiness. That offer was made upon the following terms:

"This offer is conditioned upon the purchaser's ability to obtain a loan secured by a first mortgage of said premises in an amount equivalent to 75% of the aforesaid purchase price. Purchasers shall have 20 days in which to obtain said loan commitment.

Sellers agree that they will not extend any leases for apartments in said building pending the closing of the deal * * *."

The listing agreement itself was silent as to any specific terms and conditions beyond the selling price. The defendant admits in its brief that the offer of April 8, 1974, 30 days after Kenilworth's authority had been terminated, was "a conforming offer from a prospective purchaser." Since this offer also contained the clause whereby Sandquist agreed not to extend any leases pending the closing, we must assume that the mortgage contingency clause was the cause of the rejection of that offer as being outside the terms of the agreement. Sandquist argues that the inclusion of this contingency clause prevents the conclusion that Triangle was a ready, willing and able purchaser.

In *Garrett v. Babb* (1975), 24 Ill. App. 3d 941, 322 N.E.2d 217, the court amplified the standard previously set forth in *Fox v. Ryan* (1909), 240 Ill. 391, 88 N.E. 974:

"* * * A prospective purchaser of realty will be considered ready, willing and able to buy if he has agreed to purchase the property and has sufficient funds on hand or if he is able to command the necessary funds with which to complete the purchase within the time allowed by the offer. (*William C. Bender & Co. v. Tritz* (1949), 338 Ill. App. 661, 88 N.E.2d 519.) * * *

* * * On appeal, we will not substitute our judgment for that of the jury where there is sufficient evidence in the record to support the jury's determination. [Citation.] * * * We hold, therefore, that under the test of readiness, willingness and ability stated in *Bender, supra,* a broker who shows that he produced a prospective purchaser who agreed to the sellers' terms, who was continuously willing to purchase during the time of the relevant negotiations and who became able to execute a contract upon the agreed terms at a reasonable time subsequent to the initial negotiations, has made a prima facie case for recovery of his commission. The commission is earned upon the simultaneous concurrence of the buyer's readiness, willingness and ability." *Garrett,* at 945-46.

The defendant relies on a number of cases in which the court held that

the inclusion of a mortgage contingency clause in and of itself creates a condition which invalidates the contract. However, these cases can be distinguished upon their facts. In *Spilky v. McDonald* (1968), 94 Ill. App. 2d 411, 236 N.E.2d 907, the asking price was $460,000. Although the offer met this price, the seller was to receive only $200,000 in cash at closing, with the balance to be paid in installments over a five-year period. The court found that in the absence of any evidence that the defendant agreed to accept deferred payments, the transaction required a cash sale. In the instant case, no deferred payments were proposed, with Triangle offering to pay cash at closing, contingent upon obtaining financing within 20 days after acceptance of the offer.

*Katz v. Brooks* (1965), 65 Ill. App. 2d 155, 212 N.E.2d 508, involved an exclusive listing agreement which authorized the realtor to procure a purchaser at a sales price of $112,000. A deposit of 10% was required, and the balance was to be paid entirely in cash. The agreement was to expire without notice on September 15, 1962. On September 13, the plaintiff submitted a contract of purchase for the property at a price of $110,000. The contract was specifically subject to the prospective purchaser's ability to obtain a mortgage and his approval of various leases in effect for the subject premises. The court reversed the judgment awarding the plaintiff its commission, noting that he did not procure a purchaser ready, willing and able to buy the defendant's property. However, the offer in *Katz* was made two days before the listing agreement was to expire, and was for less than the full asking price.

■■ In the instant case, Triangle's offer was made long before the listing agreement was to expire. Unlike the offer in *Katz*, Triangle's offer was for the full asking price of $950,000. By rejecting that offer and subsequently revoking the agreement without allowing the 20-day period described in the offer to run, Sandquist made the question of whether Kenilworth produced a ready, willing and able buyer one of fact for the jury. Kenilworth proved to the jury's satisfaction that Triangle would have performed the contract and was in fact, ready, willing and able to purchase the property.

■■ In *Cooper v. Liberty National Bank* (1947), 332 Ill. App. 459, 75 N.E.2d 769, cited by the plaintiff, the broker procured a purchaser who entered into a contract with the defendant seller. That contract contained a mortgage contingency clause. Neither the purchaser, the broker, nor the seller were able to procure a mortgage and the property was not sold. The plaintiff broker brought suit alleging he was entitled to a commission because he tendered a purchaser who was accepted by the defendant seller. The court stated the rule that a broker is entitled to a commission when he provides a purchaser ready, willing and able and concluded that the purchaser here was not able and therefore, the broker was not entitled

to a commission. *Cooper*, like *Spilky* and *Katz* does not support the defendant's proposition that a mortgage contingency clause in and of itself creates a condition that invalidates this contract.

■■ In the instant case, the listing agreement was silent as to any terms and conditions beyond a selling price of $950,000. The practice of inserting contingency clauses while financing arrangements are being made where the listing agreements does not specify what form the contract should take or the mechanics of the sale is not unusual. However, the presence or absence of a mortgage contingency clause is not the sole deciding factor as to whether Triangle Builders was a ready, willing and able buyer. Before making an offer, Gromke and Metroff consulted their primary financial sources, Northwest Federal Savings and Loan and Fidelity Savings and Loan. Both institutions, with whom Gromke and Metroff individually and as Triangle Builders, had had dealings over an extended period of time, gave their oral commitment. There was testimony that the bulk of the lending by these institutions was done on an oral basis and that lending institutions routinely do not make written commitments until a contract has been signed. There was also testimony that the verbal commitment of Northwest Federal was contingent upon an appraisal and a signed contract, and that of Fidelity was contingent upon a signed contract and an inspection of the interior of the building. The $950,000 offer with the mortgage contingency clause was made on February 1, 1974, and rejected on February 4. It was on March 7, 1974, after Sandquist was advised that Triangle was persisting and was preparing to make a full cash, no mortgage contingency offer, that the listing was terminated.

Both Gromke and loan officers from the two lending institutions testified as to Triangle's experience and fiscal ability. There was evidence that these were men of substantial financial resources who could command the money necessary to complete the transaction. There was also testimony regarding Sandquist's concern with the tax consequences of a sale at the time Kenilworth submitted Triangle's offer. We believe that there was competent evidence from which the jury could properly infer that Kenilworth had produced a ready, willing and able purchaser in Triangle Builders, able to command the necessary funds with which to complete the purchase within the time allowed by the offer, for the listed price of $950,000 in accordance with the terms of the listing agreement.

■■ Since the jury found that Kenilworth had performed its obligations under the listing agreement and was entitled to its commission of five percent of the purchase price plus $500 ($48,000), the question of the presence or absence of a basis for a *quantum meruit* recovery is moot.

■■ Finally, the defendant argues that the trial court committed

reversible error where it refused to give the defendant's instructions regarding the consequences of a revocation both with and without cause of a broker's authority to the jury. Supreme Court Rule 366 (Ill. Rev. Stat. 1975, ch. 110A, par. 366(b)(2)) sets forth the rule governing the scope and procedure of review in jury cases.

While the defendant cites 366(b)(2)(i) which states: "No party may raise on appeal the failure to give an instruction unless he shall have tendered it," he omits any reference to (b)(2)(iii) which states: "A party may not urge as error on review of the ruling on his post-trial motion any point, ground, or relief not specified in the motion." (Ill. Rev. Stat. 1975, ch. 110A, par. 366(b)(2)(i) and (iii).) The post-trial motion filed by the defendant makes no reference to any alleged error by the court in refusing to give the jury instructions tendered by the defendant. In light of this omission, the defendant is precluded from raising this issue on appeal. *Clifford v. Schaefer* (1969), 105 Ill. App. 2d 233, 247, 245 N.E.2d 49; *Snelson v. Pennsylvania Life Insurance Co.* (1965), 65 Ill. App. 2d 416, 430, 212 N.E.2d 873.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

McNAMARA, J., concurs.

Mr. PRESIDING JUSTICE SIMON, dissenting:

My view is that Kenilworth did not have a ready, willing and able buyer at any time prior to March 7, 1974, when Sandquist terminated Kenilworth's agency. Because the February 1, 1974, offer was contingent upon the prospective purchaser obtaining a mortgage, it was only a proposal without consideration for an option to purchase. Had Sandquist accepted the offer, Triangle Builders would have tied up the property for 20 days without any reciprocal obligation to Sandquist. Triangle Builders was free to walk away at the end of 20 days and recover its earnest money deposit, while the proposal would have required Sandquist to commit his property to Triangle Builders during the 20 days. If during that period Sandquist found someone offering an all-cash deal at his price, and ready to sign without contingencies, he would have been precluded from concluding such a deal. Nothing in the listing agreement Sandquist gave Kenilworth indicates he intended to subject himself to such a contingency.

The conditional nature of the February 1 offer submitted by Triangle Builders is demonstrated by the offer's failure to set forth the pertinent details of the desired mortgage, such as the interest rate and the period of amortization, as is usually done where mortgage availability is a condition

of a contract. (See, *e.g., O'Brien v. Kawazoye* (1975), 27 Ill. App. 3d 810, 812, 327 N.E.2d 236.) Even though an offer including such details still would have been inconsistent with the terms of the listing (see *Katz v. Brooks* (1965), 65 Ill. App. 2d 155, 158, 212 N.E.2d 508), it would have given Sandquist the information needed to decide whether to supply the required financing himself if Triangle Builders was unable to obtain the mortgage. It also would have given Sandquist a basis for determining the likelihood of Triangle Builders obtaining the financing, and in turn determining whether to tie up his property on the offered contingency.

The February 1 offer further prejudiced Sandquist by another condition not included in the listing. It precluded him from extending any of the apartment leases pending the closing of the transaction. With more than one-third of the leases expiring within 90 days, it was clearly disadvantageous for Sandquist to be unable to negotiate with his tenants during the 20-day period while Triangle Builders remained uncommitted. The majority points out that Sandquist's brief acknowledges that the April 8, 1974, offer, which did not contain a mortgage contingency, was a conforming offer even though it contained an identical prohibition against extending leases. The majority then concludes that this condition was not a valid reason for the rejection of the February 1 offer. From Sandquist's viewpoint, a requirement not to extend leases was far more onerous in the context of the February 1 offer because it did not bind Triangle Builders to anything. In contrast, the April 8 offer committed Triangle Builders to the deposit of $25,000 in earnest money with no requirement that Sandquist return it. This fund would have mitigated damages he suffered from loss of tenants in the event the purchaser backed away. Thus, the reference to the apartment leases in the February 1 offer was an additional condition which justified Sandquist's rejection.

Neither the mortgage contingency nor the restriction on extension of leases was mentioned in the listing agreement between Kenilworth and Sandquist as an acceptable condition of any offer submitted. Therefore, regardless of whether Sandquist had second thoughts about selling his property or whether he acted out of a concern about his income tax liability in the event of a sale, his rejection of the February 1 offer was justified. A broker who produces a buyer offering to purchase on terms which vary from those contemplated by the listing agreement is not entitled to a commission unless the seller accepts the terms offered. (*Sharkey v. Snow* (1973), 13 Ill. App. 3d 448, 452, 300 N.E.2d 279.) Although the majority states that inserting contingency clauses in real estate contracts while financing arrangements are being made, where the listing agreement does not specify what form the contract should take or the mechanics of the sale, is not an unusual practice, the record in this case does not support the conclusion that this is a trade custom or usage in the

real estate business. Even if it were, it would be necessary to establish such a trade custom or usage by evidence of what percentage of the purchase price the usual mortgage contingency clause provided for and what the interest rate and period of amortization was required to be to satisfy the trade custom or usage. The record is devoid of such evidence.

I believe the majority improperly discounts the authority of *Katz v. Brooks*. That opinion holds that a broker who produces an offer containing even a more specific mortgage contingency clause than the one in this case has failed to produce a buyer ready, willing and able to meet the seller's requirements where the listing agreement is silent as to financing. Although in *Katz* the offer was produced 2 days before the termination of the listing agreement, the court did not rely on this fact. And while the court did rely on the offer's failure to meet the owner's requested price as a ground for the decision, it used the mortgage contingency clause as an alternative ground for the decision. The opinion dealt at length with the significance of the mortgage contingency clause, holding:

> "The purchaser was not legally bound to buy the property under the proposed contract since he had the discretionary right to cancel it if the leases contained 'unusual clauses or other provisions' and since by its terms the contract became null and void if the mortgage was not obtained. In Cooper v. Liberty Nat. Bank of Chicago, 332 Ill. App. 459, 75 N.E.2d 769, the court rejected a broker's claim for his commission where the contract of purchase contained a mortgage contingency clause substantially similar to that in the instant case. The court stated that the contract was conditional, not binding, and that the purported purchaser was not presently 'able' to buy the subject property. Plaintiff in the instant case went to great lengths to prove that the proposed purchaser had the assets necessary to finance the deal. However, since the contract became null and void unless the $80,000 was obtained through a mortgage, the worth of the purchaser was of no significance whatsoever." (*Katz*, at 158-59.)

I regard *Katz* as well as *Sharkey v. Snow* as adequate authorities for the conclusion that the mortgage contingency as well as the restriction on lease extensions gave Sandquist the legal right to reject the offer. Having failed to produce a buyer prepared to meet Sandquist's terms, Kenilworth should have been denied recovery as a matter of law.

The majority reasons that Sandquist's rejection of the offer and subsequent revocation of the listing agreement made the issue of whether Triangle Builders had command of the funds required for the transaction within the 20-day period a question of fact for the jury. Even if this had been a proper issue for the trier of fact, the evidence does not support

Kenilworth's recovery on this basis. In *Epstein v. Howard* (1955), 5 Ill. App. 2d 553, 558, 126 N.E.2d 162, this court said:

> "In William C. Bender & Co. v. Tritz, the late Judge Tuohy stated the general rule announced in McCabe v. Jones, 141 Wis. 540, to the effect that financial ability presupposes sufficient funds on hand or ability to command the necessary funds in the time allowed by the offer. The term 'command' is important. In Walton v. Hudson, 83 Ohio App. 330, 79 N.E.2d 921, 924 cited by plaintiff the court said the cases uniformly hold the purchaser cannot show ability by depending on third persons ' "in no way bound to furnish the funds." ' We think command here means 'To have control of.' " *Epstein*, at 558.

The only way Triangle Builders could have commanded the necessary funds within the 20-day period was by obtaining a mortgage commitment, but the evidence indicates that neither of the two lenders which Triangle Builders approached was willing to make a binding commitment during the period. Roy Gromke of Triangle Builders testified that he made written applications to Northwest Federal and Fidelity Federal for a loan of $712,500, but he had no written commitment on February 1, and he could not say whether Triangle Builders was able to close the deal without a mortgage. While Mr. Holtzer of Northwest testified that he orally agreed to loan 80 percent of the lower of the purchase price or appraised value, no document reflecting this commitment was ever prepared. Mr. Pettise of Fidelity testified that he orally committed Fidelity to Mr. Gromke for $712,500, but there was to be no written commitment until Mr. Gromke had a signed contract from Sandquist, the lender had made an inspection of the interior, and the loan had been approved by both the loan committee and the board of directors of Fidelity. There was no evidence that Fidelity ever made an interior inspection. Given these contingencies, Triangle Builders did not have command of funds from Fidelity. In fact, Fidelity never extended a written mortgage commitment to Triangle Builders on Sandquist's property. The only written commitment actually obtained by Triangle Builders came from Northwest more than 2 months after the first offer was rejected and also after Kenilworth's authority was terminated. And not only was it tardy, but the commitment was for only $680,000, a sum which did not satisfy the mortgage contingency in the February offer. Thus, Triangle Builders did not have the financial ability to proceed with the purchase on February 1 when the offer was submitted or at any time up to the termination of Kenilworth's agency on March 7.

Mr. Pettise's testimony does not support the conclusion that Sandquist prevented Triangle Builders from obtaining financing from Fidelity by refusing to sign the February 1 offer. If a contract signed by Sandquist

was in fact the only obstacle to obtaining a loan from Fidelity, Triangle Builders could have submitted an offer without the mortgage contingency and then delivered the resulting contract to Mr. Pettise to obtain the commitment. The majority seems to believe that oral commitments from Northwest and Federal made prior to any offer by Triangle Builders represented adequate command of the required cash. If this was so, Triangle Builders would not have incorporated the mortgage contingency into the offer, particularly after Sandquist stated his objection to it. In short, Triangle Builders' insistence upon the mortgage contingency clause indicates that it did not have command of the necessary funds notwithstanding the oral commitments it claimed to have prior to February 1.

It is entirely speculative whether Triangle Builders could have secured its financing sooner if Sandquist had accepted the February 1 contingent offer. In fact, both Mr. Gromke and Mrs. Manker of Kenilworth testified that an MAI appraisal was a prerequisite for a mortgage, and Mrs. Manker told Sandquist at the end of February that the only way Triangle Builders could submit a full price cash offer was to have an MAI appraisal. The appraisal was not conducted until March 1, and, according to Sandquist, Gromke told him a week after the appraisal that the appraisal figure was $100,000 less than Sandquist's price of $950,000. Sandquist's testimony was corroborated by the loan Northwest later offered. As pointed out above, Mr. Holtzer said Northwest was willing to loan 80 percent of the appraised value. The loan of $680,000 that institution offered in writing on April 3, 1974 is 80 percent of $850,000. Undoubtedly, this is the explanation for Triangle Builder's inability to demonstrate that it had adequate financing until a month after Sandquist revoked Kenilworth's authority.

The evidence is clear that Triangle Builders did not have financing prior to April 8 and thus was not a ready, willing and able buyer prior to March 7, when Sandquist terminated Kenilworth's agency. There was not sufficient evidence to submit to the jury on the issue of whether Triangle Builders was in command of the necessary funds prior to March 7, 1974. The verdict returned was, therefore, against the manifest weight of the evidence. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504; *Belleville National Savings Bank v. General Motors Corp.* (1974), 20 Ill. App. 3d 707, 313 N.E.2d 631; *Yates v. Cummings* (1972), 4 Ill. App. 3d 899, 282 N.E.2d 261.

*Garrett v. Babb* (1975), 24 Ill. App. 3d 941, 322 N.E.2d 217, does not support Kenilworth's right to receive a commission. In that case, the seller accepted an earnest money deposit, shook hands with the buyer and said, "You have bought yourself a good farm." In the case before us, Sandquist rejected the offer and did not accept any earnest money. And in *Garrett*

the buyer managed to arrange for additional financing during the time the seller took to prepare a satisfactory contract and submit it to the buyer, a period of approximately 34 to 41 days. In this case, it was not until 66 days after its unaccepted offer that Triangle Builders indicated to Sandquist that it had arranged for financing.

As the majority points out, the parties agree that Sandquist had the power to revoke Kenilworth's listing at any time. (*Nicholson v. Alderson* (1952), 347 Ill. App. 496, 107 N.E.2d 39; 5 Ill. L. & Prac. *Brokers* §28 (1953).) Although Kenilworth would have earned its commission if Sandquist revoked the agency after the broker had produced a purchaser able, ready and willing to buy, that did not occur here. The first indication that Triangle Builders was prepared to meet the terms specified by Sandquist in its agreement with Kenilworth was on April 8, 1974, 1 month after Sandquist revoked the agency. I would reverse and remand so that Kenilworth can recover on a *quantum meruit* basis for its expenses and the value of its services.