REAL ESTATE GROUP, INC., Plaintiff,

v.

Stuart SARGENT and Leisure Management Corporation, Inc., Defendants.

No. 87 C 9177.

United States District Court, N.D. Illinois, E.D.

May 13, 1988.

Ira J. Bornstein, Harvey J. Barnett & Assoc., Chicago, Ill., for plaintiff.

John K. Grubb, Joseph W. DiCecco, Grubb & DiCecco, Houston, Tex., for defendants; Philip Fertik, Adams, Fox, Adelstein & Rosen, Chicago, Ill., of counsel.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

The Real Estate Group, Inc. ("REG") has sued Stuart Sargent ("Sargent") and Leisure Management Corporation, Inc. ("Leisure"), charging breach of a July 22, 1986 exclusive real estate brokerage letter agreement (the "Agreement") between

REG and Sargent.[1] Sargent moves to dismiss the Complaint under Fed.R.Civ.P. ("Rule") 12(b)(6) for failure to state a claim for which relief may be granted. For the reasons stated in this memorandum opinion and order:

1. Sargent's motion is granted.

2. This Court also establishes an appropriate procedure and timetable for the possible dismissal of this action as well.

### Facts [2]

REG is an Illinois corporation engaged in the real estate brokerage business. Sargent is a Texas citizen affiliated with Leisure, a Texas corporation.

On July 22, 1986 REG and Sargent entered into the brief Agreement, under which REG was employed as the "exclusive real estate broker" to locate commercial space in the Chicago area for lease or purchase by Sargent or any affiliate.[3] In its final paragraph the Agreement said:

> This agreement shall automatically terminate in one year from the date of acceptance, except that it shall remain in effect as to any properties introduced to you during this agreement....

On April 9, 1987 Leisure wrote REG purporting to terminate the exclusive agreement immediately. Not long after that either Sargent or Leisure[4] purchased commercial property in Chicago. In any event, the purchaser did not impose a requirement on the seller to pay REG a commission—although including such a requirement in any purchase contract was incumbent upon Sargent and Leisure during the lifetime of the Agreement.[5]

### Parties' Contentions

REG says Sargent and Leisure breached the Agreement because it could not be terminated during its one-year term and because it required them to assure (as they did not) that REG would receive a commission when they bought the property. For their part, Sargent and Leisure retort:

1. No contract was formed because the Agreement was insufficiently precise in defining its terms.

2. Under the Agreement Sargent and Leisure retained both the right to terminate the brokerage at will and the right to deal directly with sellers, the exercise of either of which rights operates to defeat REG's claim.

Each of those responses will be discussed in turn.

### Contract Formation

■ There is no question a contract existed between REG and Sargent—a relationship formed by the parties' words or by conduct evidencing a mutual intent to be bound. Both REG and Sargent signed the Agreement, which imposes obligations on each. They then performed under its terms for eight months. Indeed the existence of a contract may even be inferred from the fact that when Leisure no longer wished to be bound, it wrote REG specifically "terminating" the Agreement.

---

1. REG initially brought suit in the Circuit Court of Cook County, Illinois. Sargent and Leisure removed the action to this District Court because of diversity of citizenship.

2. Familiar Rule 12(b)(6) principles require this Court to accept as true all well-pleaded factual allegations, drawing all reasonable inferences in plaintiff's favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam). This statement of facts conforms to that requirement.

3. Sargent signed the Agreement "Personnally (sic) and for any entity with which I am or become affiliated." Leisure has not suggested it was not bound by the Agreement if Sargent was.

4. This reflects REG's perfectly proper pleading in the alternative (see Rule 8(e)(2)). For current purposes it does not matter which one bought the property (see n. 3).

5. REG does not allege it "introduced" the property to Sargent or Leisure, so as to bring into play the Agreement's post-termination effectiveness provision quoted in the text. Because such an allegation would obviously have changed the entire nature of REG's claim for the better, this opinion assumes REG did *not* locate the property.

Defendants point to two "deficiencies" in the Agreement as purportedly showing there was no meeting of the minds:

1. its failure to specify the amount of REG's compensation and

2. its failure to identify the term of the exclusive brokerage agreement.

Neither "failure" is at all problematic.

As to compensation, the Agreement says:

You [Sargent] shall have no obligation to pay [REG] for its services but rather you agree that any lease or purchase agreement into which you enter relative to the above space shall provide that the landlord or seller shall pay [REG] one full normal real estate commission in cash concurrently with the execution, if a lease, or closing, if a sale.

Sargent's duty to REG is explicit and precise. He must insert certain terms in any lease or purchase contract. Failure to do so is a breach. Granted, the Agreement does not quantify "one full normal real estate commission"—but that is a matter of proof at trial, not a fatal flaw on the face of the contract.

As to the asserted lack of a termination date in the Agreement, it does specify an automatic termination one year from its execution. Whether the Agreement was terminable before that time is the type of gap-filling that is routine in contract interpregation, and as to which the lack of an explicit provision by no means invalidates the entire Agreement.[6]

*REG's Rights Under the Agreement*

Under Illinois law (cf. *Thorne v. Elmore,* 79 Ill.App.3d 333, 340–41, 34 Ill.Dec. 846, 853, 398 N.E.2d 837, 844 (1st Dist.1979))[7] REG would be entitled to a commission from defendants:

1. if REG had an exclusive agency agreement with them and the property was sold while the Agreement was in effect; or

2. if REG produced a "ready, willing and able" seller of property conforming to defendants' requirements; or

3. if an actual purchase was procured through REG's efforts.

REG has claimed its entitlement to a commission only under the first of those alternatives.[8]

■ While defendants assert the April 9, 1987 letter revoked REG's exclusive agency, REG says the Agreement was for a fixed term of one year and therefore could not be revoked before then. On that score the general rule is that a principal may revoke a broker's agency "at any time and under any circumstances" (*Lehman v. Eugene Matanky & Associates, Inc.,* 107 Ill. App.3d 985, 990, 63 Ill.Dec. 683, 688, 438 N.E.2d 614, 619 (1st Dist.1982)). Indeed, the case law reflects such a *power* (as contrasted with a *right*) to revoke exists even when the parties have specifically contracted for a fixed or minimum term. In that event the principal's premature revocation is a breach (*Kenilworth Realty Co. v. Sandquist,* 56 Ill.App.3d 78, 82–83, 13 Ill.Dec. 844, 847–48, 371 N.E.2d 936, 939–40

---

**6.** REG points to Ill.Rev.Stat. ch. 111, ¶ 5819 as assertedly validating the Agreement because of the automatic termination clause. But by its terms that statute applies only to listing contracts—which the Agreement is not.

**7.** At this Court's request the parties briefed the choice-of-law issue. Both agree—their only area of agreement—on the applicability of Illinois law. As for *Thorne,* like most if not all of the decided cases it deals with the recurring problem of a *seller's* liability for commissions under a brokerage agreement. Though the current situation involves a prospective *buyer's* promise to cause the seller to pay a commission, the principles are the same. Hence the case holdings may readily be adapted to this case (as this sentence of the text is about to do).

**8.** While Complaint ¶ 4 says REG did identify several potential properties for defendants, nothing in the Complaint even suggests any of those prospects entitled REG to a commission under the second ground identified in the text. In fact, the Agreement (the only contract adverted to in the Complaint) is really silent as to defendants' requirements for the real estate to be acquired, so REG does not offer anything evoking a reasonable inference that it had produced such a conforming property. As to the third ground referred to in the text, n. 5 has already shown the Complaint impliedly forecloses that possibility. In short, the Complaint clearly must stand or fall on the theory that Leisure's purchase occurred while the Agreement was in effect.

(1st Dist.1977)), even though the revocation itself is effective and the agency relationship is destroyed (*id.* at 82, 13 Ill.Dec. at 847, 371 N.E.2d at 939; *Nicholson v. Alderson,* 347 Ill.App. 496, 506–07, 107 N.E.2d 39, 44 (2d Dist.1952)).

It seems plain that the Agreement does not create an exclusive agency for a binding one-year term, although neither side cites (and this Court's research has not found) any Illinois case interpreting language of the precise nature employed in the Agreement.[9] Three factors counsel treating the Agreement as having created a terminable agency. First, that is the most natural (though not the only possible) reading of the language the parties did use. Second, the maxim of *contra proferentem* —the interpretation of ambiguous language against the drafter (in this case REG)—clearly favors defendants' construction. Third and perhaps most important, the common law presumption that an agen-

cy is revocable at will provides the logical gap filler when a contract is essentially silent on the subject.

■ Defendants were therefore within their rights in terminating the Agreement. However, even if the opposite reading were given its terms—even were REG correct in urging the Agreement was for a fixed term —its rights would be limited to recovery in quantum meruit, rather than to payment of the brokerage fee it would have been entitled to under the Agreement (*Nicholson,* 347 Ill.App. at 508, 107 N.E.2d at 44).[10] While it is true that pleadings are normally tested by a plaintiff's potential for obtaining any relief based on its factual allegations (rather than by the theory it advances for recovery), in this instance REG would face jurisdictional problems even if the Agreement were held to be for a fixed term.[11]

---

**9.** Brokerage agreements held to be for a fixed term typically contain quite explicit language such as that found in *Kenilworth,* 56 Ill.App.3d at 80, 13 Ill.Dec. at 845, 371 N.E.2d at 937:

> for a period of six months, and thereafter until said authority is cancelled by 30 days advance written notice of either party to the other.

Here the Agreement places an outside limit on the duration of the agency, without expressly (or, as the text explains, impliedly) committing the parties for the term bounded by that outside limit.

**10.** *Nicholson* is extraordinarily puzzling in this respect. Its holding just described in the text is in direct conflict with the following language from 4 R.C.L. at 253–55, the very authority *Nicholson* itself quotes at length with apparent approval:

> While the law recognizes his power to revoke the broker's authority [despite a fixed term contract], it does not recognize his right to do so, for it results in a repudiation of his contractual obligations.... Where by revoking the broker's authority, the latter is entitled to recover as damages, not only the value of such services as he has already rendered together with such disbursements as he has made in his employer's behalf, but also such prospective profits as he can reasonably establish would have been his but for the wrongful revocation of his authority.

That last clause would clearly entitle the injured broker to recover a full commission. Yet astonishingly enough, that quotation from R.C.L immediately precedes *Nicholson*'s announcement of its own dramatically different rule (indeed,

this Court—then an active practitioner in substantial real estate matters, representing one of Chicago's major brokerage firms as well as numerous buyers and sellers of commercial, industrial and large residential properties—well recalls the shock waves that went through the similarly situated legal community when *Nicholson* was decided). But however illogical the *Nicholson* decision may seem in relation to its claimed underpinning, this Court has found no case disputing the validity or current viability of *Nicholson* as an accurate statement of Illinois law. *Kenilworth,* 56 Ill.App.3d at 82–83, 86, 13 Ill.Dec. at 847–48, 850, 371 N.E.2d at 939–40, 942 allowed a broker to recover a brokerage fee after the court had determined there had been a wrongful revocation, but that outcome rested squarely on the court's conclusion that the broker had fully performed by procuring a ready, willing and able buyer *before* the wrongful revocation (that analysis is borne out not only by the *Kenilworth* opinion itself but by the dissent of Judge (later Justice) Seymour Simon, *id.* at 87–92, 13 Ill.Dec. at 850–54, 371 N.E.2d at 942–46). Both the *Kenilworth* majority's determination and the dissent would really have been unnecessary (or beside the mark) had wrongful revocation *followed* by a sale within the original contract period been enough to warrant recovery of the commission. *Kenilworth* is thus wholly consistent with the *Nicholson* holding.

**11.** Quantum meruit recovery, as described in *Nicholson,* is limited to the broker's actually incurred expenses. There is surely little reason to believe REG's expenses could have exceeded the $10,000 minimum required for federal jurisdiction. That issue need not be faced, though,

All this has assumed defendants agreed to purchase their property after the Agreement was terminated. Illinois law does allow an exclusive agent to collect a commission, even when it was not the procuring cause of the sale and though the sale was not yet reduced to writing, *if* the principal had agreed to a sale during the term of the exclusive agency (*Bolger v. Danley Lumber Co.,* 77 Ill.App.3d 207, 210, 32 Ill.Dec. 685, 688, 395 N.E.2d 1066, 1069 (1st Dist.1979)). Here Complaint ¶ 6 says (on information and belief) defendants purchased the property "soon after" the termination, and Complaint ¶ 9 says (again on information and belief) the termination was to avoid REG's commission. It would be a real stretch to read those allegations as saying defendants had reached an agreement with the seller *before* they revoked the Agreement. Nevertheless, because it is at least conceivable REG could make such an allegation in good faith, it will be granted leave to replead.[12]

Defendants also contend that even if the Agreement were still in effect when Leisure purchased the property, defendants had no duty to provide for a commission for REG because a principal in Leisure located the property. By its very nature that contention cannot be addressed without reference to factual assertions outside the Complaint. For that reason, and also because the Complaint is being dismissed on other grounds, it would be premature to decide whether the Agreement would call for a commission to REG under the circumstances defendants advance. All the same, defendants would clearly have a difficult row to hoe in that respect.[13]

### Conclusion

Defendants have shown the Complaint does not state a claim on which relief may be granted. It is therefore dismissed. REG is granted until May 24, 1988 to file (in this Court's chambers) an amended complaint consistent with this opinion.[14] If plaintiff does not do so, this entire action will be dismissed May 27, 1988.[15]

---

because the Agreement was not in fact for a fixed term.

12. D.Mem. 2 says the property defendants purchased was located after the Agreement was terminated. That statement is of course not properly considered on the current motion (*Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984)). Nonetheless REG is now on notice as to what defendants say the facts are and hence REG, to satisfy its Rule 11 obligations, must assess carefully whether it can in good conscience allege the factual basis for a sustainable claim in an amended complaint.

13. *Brown v. Miller,* 45 Ill.App.3d 970, 971–73, 4 Ill.Dec. 649, 650–51, 360 N.E.2d 585, 586–87 (1st Dist.1977) teaches a principal retains the right to deal on its own without incurring liability for a brokerage fee unless it relinquishes that authority in "express language" (*id.* at 971, 4 Ill. Dec. at 650, 360 N.E.2d at 586). Here the difference between the usual prospective seller's agreement to pay a commission and Sargent's agreement to cause one to be paid makes that task easier. What Sargent promised was that

"*any* lease or purchase agreement *into which you* [Sargent or any affiliate] *enter* ... shall provide" for payment of a commission by the lessor or seller. That language is as "express" as anyone can desire—it is not limited in its terms, and it would be distorted by manufacturing a wholly unstated exception.

14. REG is again reminded that the nature of this federal forum as one of limited jurisdiction poses an extra problem for REG's shaping of a claim sustainable in this District Court (see n. 11). That has elements of real irony, considering the fact it was *defendants* who brought the case here via removal (which must rest on the requisite amount in controversy as well as diversity of citizenship)—see n. 1.

15. If this Court had found the Agreement was for a fixed term and thus had been wrongfully revoked by Leisure, the proper disposition would be a remand to the state court because the action had been "removed improvidently and without jurisdiction" (28 U.S.C. § 1447(c)); see *Ross v. Inter-Ocean Ins. Co.,* 693 F.2d 659, 662–63 (7th Cir.1982)).